Filed 11/20/15  P. v. Smith CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067220 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD245756) |
| JOSHUA SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Laura H. Parsky, Judge.  Affirmed.

Denise M. Rudasill, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Christen Somerville, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Joshua Smith of corporal injury to a spouse, assault by means likely to produce great bodily injury, false imprisonment by violence, and resisting or delaying a peace officer. The trial court suspended imposition of sentence for three years and placed defendant on formal probation, but also ordered that defendant serve 365 days in local custody. Defendant contends the trial court erred by excluding impeachment and character evidence regarding the victim and one of the arresting officers. He further contends the prosecutor engaged in misconduct by indirectly commenting on defendant's election not to testify. We reject these contentions and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Prosecution Case*

The charges against defendant arose from a domestic violence incident that involved his then-wife, Tanika Lee, on January 17, 2013. The trial court allowed Lee to testify under Evidence Code section 1109 regarding prior instances of domestic violence involving defendant.[1] Defendant does not challenge the trial court's admission of those prior instances.

---

[1] Unspecified statutory references are to the Evidence Code.

Section 1109, subdivision (a)(1) provides: "Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

2

*Prior Instances*

Lee and defendant met in Redding, California, and dated for about two years before marrying in 2012.  Their dating relationship was "rocky" and defendant became violent with Lee on several occasions.  The first four or five instances involved defendant pushing and shoving Lee and hitting her in the back.  When she discussed the possibility of calling the police, he told her he hit her in the back " 'on purpose so that there's no marks.'. . .  So there's nothing [she] can do about it."  Lee did not call the police because she thought it would be an "over-dramatic response."

On another occasion when Lee and defendant were arguing, he kicked her in the stomach and chest, knocking the wind out of her.

Another time defendant was "reckless[ly]" kicking in Lee's direction, "[thinking] he was being funny," when he kicked Lee in the face, leaving "a pretty good bruise all around [her] mouth."

During one argument in Lee's house in Redding, she told defendant to leave, but he refused.  He laid on the bed and pressed his foot against Lee's throat, pinning her against the wall.  At some point during this argument, Lee threw a glass jar at defendant, striking him and causing the jar to break.  Lee had not consumed alcohol that day and could not remember whether defendant had.  She could not remember whether she threw the jar before or after defendant began being physical with her on this occasion; if she threw it first, this was the only occasion on which she initiated physical violence during an argument with defendant.

3

When Lee and defendant planned to move to San Diego, they visited and stayed in a hotel while looking for apartments. During an argument at the hotel, defendant grabbed Lee by the shoulders, threw her down on the floor, then grabbed her throat and applied pressure. Neither had been drinking alcohol. Lee did not call the police because she was embarrassed and did not know anybody in San Diego.

After Lee agreed to marry defendant, their relationship improved and the violence stopped. They moved to San Diego early in 2012 and married at the courthouse in August. They shared a two-bedroom apartment with another couple, Rachel Cusing and Michael Van Dyck.

Two days after the wedding, Lee, defendant, and their roommates were swimming at a friend's pool. Lee and the roommates were casually drinking cocktails by the pool, but defendant "was really drinking," as if something had upset him. After defendant disappeared for awhile, Van Dyck found him face down on the grass next to Lee's car; he had broken off the side mirror. They all returned to the apartment, where defendant became sick. Lee encouraged him to stay in the bathroom so he would not make a mess, but defendant resisted. He grabbed her throat with both hands; pushed her to the ground; straddled and strangled her; placed his knee on her throat; and hit her face six times. Lee testified defendant stopped when Van Dyck knocked on the bedroom door.[2] Lee crawled into bed and fell asleep.

---

[2] Van Dyck testified he did not knock on the door during the incident, but described Lee's appearance the following day as "look[ing] beat up"—she had "black eyes" and

The next morning, Lee's face was "completely black and blue" and swollen; she "couldn't tell where [her] chin began and [her] neck ended." She also had trouble swallowing and closing her jaw completely. Lee was scheduled to work that day, but knew it would be obvious to everyone what had happened to her. She called her supervisor and "made up some horrible story" about not being able to work because her son had been hurt.[3] Lee worried she would lose her job because she would not be able to return to work for a while. She ultimately left that job as a result of the incident, but found a new job a few months later.

There was no "memorable" violence between defendant and Lee between the August 2012 incident and January 2013. By then, however, their relationship was "exceptionally strained."

*The January 17 Incident*

On January 17, 2013, Lee worked a half-day at her new job. She unsuccessfully tried to reach defendant throughout the morning to tell him that someone she met through work might be interested in buying one of the puppies he was selling. She went home after lunch and watched a movie in the living room while Van Dyck prepared dinner in the kitchen for his girlfriend. Lee testified she drank one Coors Light with Van Dyck, but

---

"bruises everywhere"—and she was "having trouble walking." He did not see the bruises on Lee the night before.

[3]     Lee's supervisor corroborated this.

explained there were other beer cans and bottles in the living room from when defendant and Van Dyck drank together.[4]

Defendant arrived home, walked past Lee in the living room without saying a word, and entered the bedroom and shut the door. Lee was irritated with defendant because he had not gotten back to her about selling the puppy. A while later, Lee went to the bedroom to get her phone charger. The door was locked, which caused Lee to become concerned she would be unable to get ready for work the next morning. When she knocked on the door, defendant let her in, and went back to bed. Based on the way defendant jerked the door open and his other movements and mannerisms, Lee believed he was drunk and irritable.

Lee pulled the covers off the bed and told defendant to leave the room; she usually slept in the bedroom and defendant usually slept on the couch in the living room. Defendant leapt off the bed toward Lee. She tried to leave the room, but defendant grabbed her by the back of her clothing and pulled her back in. He then shoved Lee to the ground and stomped on her legs. Defendant moved between Lee and the bedroom door, put his arm around her neck in a chokehold, and began squeezing her neck tighter and tighter. Defendant wrapped his other hand around Lee's face as if he was going to snap her neck. Lee testified she did not know if she lost consciousness. She used her

---

4    Van Dyck testified he did not know how many beers Lee drank, but he thought she was drunk because she slurred when she spoke to him in the kitchen. However, Van Dyck said Lee was not slurring when he heard her on the phone 10 to 20 minutes later.

hands to pull defendant's hand away from her face and struggled to free herself. Defendant let her go and she stumbled into the living room.

Defendant pushed Lee into the couch. They both looked at Lee's cell phone. Lee grabbed it first and ran for the front door; defendant grabbed her arm, but she got away. Lee called 911 and reluctantly reported defendant had pushed and hit her, and "jumped up and down on [her] throat."[5] Lee told the operator she did not need paramedics.

Van Dyck testified that after he heard Lee knocking on the bedroom door, he heard a loud crash that sounded like a television or something metal had fallen in the living room. Van Dyck walked to the living room to investigate, but everything looked okay. He went back to the kitchen and resumed cooking until he left the house 10 minutes later. When he went to his car, he saw Lee crying and calling the police on her cell phone.

San Diego Police Officer Gilbert Lorenzo responded to Lee's 911 call and found her crying in the alleyway behind her apartment. He interviewed her inside the apartment. Lee told Lorenzo defendant had jumped up and down on her, but did not mention anything about strangling. Lorenzo testified Lee did not appear to be under the influence of alcohol; he recorded that observation on a special domestic violence report form.

Another police officer had already detained defendant. Officer John Call transported defendant in a patrol vehicle from the front of the apartment building to the

---

[5] The jury heard a recording of Lee's 911 call.

rear alleyway so that he could transfer defendant to Officer Lorenzo's vehicle. As Call placed defendant in his patrol car, defendant began screaming that he was being falsely accused. Call drove around to the back of the apartment and waited in the alleyway for Lorenzo, who was still inside speaking with Lee. Once Lorenzo returned to the alleyway, Call attempted to move defendant from his vehicle to Lorenzo's. When Call opened the door of his car, defendant "kicked the door really hard open and tried to get out." Call pushed defendant back into the vehicle. The next time Call removed defendant from the vehicle, defendant lunged forward; Call pushed defendant against the vehicle. Defendant struggled against Call, jerked back and forth, screamed, and was uncooperative. Lorenzo grabbed defendant's arm to help Call calm him. Defendant told the officers, "take these [handcuffs] off and I'll beat you guys' ass." Call and Lorenzo placed defendant face down on the ground, and he became compliant. Defendant smelled strongly of alcohol.

The day after the incident, Lee went to the Family Justice Center, where she spoke with domestic violence detectives Kevin McNamara and Silvia Vella. She did not tell them defendant strangled her because she was embarrassed.[6] Vella confronted Lee about injuries on her neck and behind her ear and asked if anything had been placed around her

---

[6]     Detective McNamara, who had over 27 years of experience with the San Diego Police Department, testified it is very common for domestic violence victims to minimize what happened. He thought Lee was doing so during the January 18 interview, particularly regarding strangulation.

8

neck.[7]  Lee cried, but did not answer.  Vella took photographs of the bruises on Lee's body.  Lee testified all the bruising was caused by defendant on January 17.

Lee returned to the Family Justice Center on January 22 and spoke to Detective Vella again.  Vella took more photographs, which depicted more bruising and broken blood vessels on Lee's arm, chest, neck, jaw, and behind her ear.  The coloring of some of the bruises suggested to Vella that the bruises were a few days old.

Lee was admitted to the hospital on January 23.  She was given a CT scan of her neck and treated with muscle relaxers and pain medication; she received a prescription for a blood thinner as a precaution.  She was released the next day.  The day after that, she moved back to Northern California.  Lee and defendant later divorced.

*The Defense Case*

Defendant did not testify.

Juan Arevalo testified he worked in a pet store and knew defendant because they previously traded animals.  Arevalo stated Lee came into the pet store on January 19 and told him about the January 17 incident.  Arevalo testified he did not see any bruises on Lee;[8] Lee smoked three cigarettes in a short time; Lee appeared intoxicated because her eyes were red and "heavy"; and Lee picked up a 55-pound bag of dog food with ease.

---

[7]    Detective Vella, who had over 24 years of experience with the San Diego Police Department, testified regarding her extensive training and experience in identifying signs of strangulation.  She further testified bruises on Lee's chest, neck, and behind her ear were consistent with strangulation with someone's hands (as opposed to with a ligature).

[8]    On cross-examination, Arevalo acknowledged seeing bruises on Lee in the photographs that were taken on January 18.

9

Rodney Erwin testified he had known defendant for about six years and Lee for three or four. Around January 19, Lee met with Erwin and told him about defendant's arrest. Erwin did not see any bruising on Lee, but acknowledged she said her neck and back were sore. He asked to see Lee's bruises, but she did not want to lift her shirt to show him.

Emily Brassieur testified she dated defendant's brother when Lee and defendant lived in Northern California. Brassieur said Lee stopped by her house after work one day and showed bruises on her hands, which Lee told her were caused by punching defendant. On cross-examination, Brassieur acknowledged she and Lee were only casual friends and admitted defendant slept with one of Brassieur's good friends when Lee and defendant's relationship was "on and off."

*The Prosecution Rebuttal Case*

In rebuttal, Lee testified she never (1) discussed her and defendant's relationship with Brassieur, (2) showed bruises on her hands to Brassieur, or (3) hit defendant.

*Jury Verdict and Sentencing*

The jury found defendant guilty of corporal injury to a spouse (Pen. Code, § 273.5, subd. (a)), assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4)), false imprisonment by violence (Pen. Code, §§ 236 & 237, subd. (a)), and resisting or delaying a peace officer (Pen. Code, § 148, subd. (a)(1)).

The trial court suspended imposition of sentence for three years and placed defendant on formal probation. The court also ordered that defendant serve 365 days in local custody.

10

DISCUSSION

## I. *Exclusion of Evidence of Lee's "Bad Character"*

Defendant contends the trial court erred by excluding evidence of Lee's conduct involving alcohol and drugs on occasions other than on January 17 and during the past incidents admitted under section 1109.

### A. *Relevant Trial Court Proceedings*

Defendant and the People filed competing motions in limine regarding the admissibility of evidence showing Lee (1) was convicted of misdemeanor driving under the influence (DUI) in 2011; (2) was arrested for (but not charged with) DUI in February 2013; (3) lied to a police officer during her February 2013 arrest, and (4) used drugs and tested positive for opiates when she checked into the hospital on January 23.

Defendant's trial counsel argued the DUI conviction and arrest were admissible to (1) establish Lee had a propensity for becoming intoxicated and, therefore, likely was intoxicated on January 17; and (2) impeach Lee because "DUI [is] specifically admissible as a crime of moral turpitude . . . ."[9]  The trial court disagreed, finding Lee's DUI conviction inadmissible because it was not a felony conviction, and "to the extent that it reflects some moral turpitude," the court balanced the section 352 factors and found the evidence's probative value was substantially outweighed by the prejudicial effect and the "risk of sidelining the jury into an issue that is not the focus of this case and this trial."

---

[9]    Defendant's original trial counsel, who withdrew before trial due to a conflict of interest, made only the propensity argument.  He acknowledged "[i]t would be silly" to seek to introduce the DUI evidence for "honesty and veracity."

11

The court applied the same section 352 analysis to the February 2013 DUI arrest. The court clarified, however, that it was "not excluding evidence of whether [Lee] was under the influence of alcohol at the time of the incident in this case. That is certainly fair game."

Defense counsel argued he should be allowed to cross-examine Lee regarding whether she made false statements to police during her 2013 DUI arrest. Defense counsel read from the police report,[10] which apparently stated Lee denied being involved in an accident, did not know where she was, and claimed to have had a passenger in the vehicle even though the investigating officer believed that was not true. The trial court excluded the evidence under section 352, explaining: "It isn't clear to the court based on the proffer that that was a calculated lie to law enforcement or whether she was asleep and passed out and so out of it that she didn't know where she was and didn't realize or remember that there had been a collision, and we would get into all of those issues if we opened the door to that in this trial. And those are completely irrelevant to the case and would sidetrack the jury."

Finally, the People moved in limine to exclude evidence of Lee's prior drug use "unless there is evidence presented that shows she was using drugs in this incident or if drug use contributed to her injuries." Lee admitted during the preliminary hearing that she snorted cocaine with defendant in the past. During argument on the motions in limine, defense counsel stated he did not "plan on introducing any sort of drug use in the

---

[10] The police report is not in the appellate record.

past, especially anything regarding snorting a line of cocaine," but noted Lee tested positive for opiates when she was admitted to the hospital on January 23 and he intended to ask her about that. The prosecutor noted the absence of any expert opinion indicating the results of Lee's January 23 drug test suggest she was under the influence of any drug on January 17. The court ruled that it would "not preclude the defense from asking [Lee] whether she had used any type of controlled substance on the date of the offense," but excluded the test results under section 352 absent "any further showing that they indicated she used drugs on January 17."

B. *Relevant Legal Principles*

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) "[T]he admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude. Beyond this, the latitude section 352 allows for exclusion of impeachment evidence in individual cases is broad. The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal.4th 284, 296 (*Wheeler*), fn. omitted.) Additionally, "impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Id.* at pp. 296-297.)

13

"Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*Clark*, at p. 932.)

"Evidence of a witness's drug use is inadmissible unless the testimony 'tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics.' " (*People v. Panah* (2005) 35 Cal.4th 395, 478.) "[T]he court is not required to admit evidence, such as cocaine or marijuana use, 'that merely makes the victim of a crime look bad.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

Although character evidence is generally inadmissible, "[i]n a criminal action, evidence of the character . . . of the victim of the crime for which the defendant is being prosecuted is not made inadmissible . . . if the evidence is:  [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character."  (§ 1103, subd. (a)(1).)  For example, a defendant charged with a violent crime may introduce evidence of the victim's violent character to support a self-defense claim.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 698-699 (*Fuiava*).)

"[A] state court's application of ordinary rules of evidence—including the rule stated in Evidence Code section 352—generally does not infringe upon" a defendant's "general right to offer a defense through the testimony of his or her witnesses." (*People v. Cornwell* (2005) 37 Cal.4th 50, 82, overruled on other grounds in *People v. Doolin*

14

(2009) 45 Cal.4th 390, 421, fn. 22; *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103 ["Although completely excluding evidence of an accused's defense theoretically could rise to [the level of impermissibly infringing on a defendant's right to present a defense], excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense."].)

## C. *Analysis*

We find no abuse of discretion in the trial court's exclusion of evidence regarding Lee's conduct involving alcohol and drugs. Significantly, the court did not exclude evidence or preclude cross-examination that would have established Lee was using alcohol or drugs on January 17 or during any of the prior instances admitted under section 1109.

We are not persuaded Lee's 2011 misdemeanor DUI conviction and 2013 arrest reflect moral turpitude. Our Supreme Court concluded in the context of attorney disciplinary proceedings that "[c]onvictions for drunk driving . . . do not per se establish moral turpitude." (*In re Kelley* (1990) 52 Cal.3d 487, 492, 494 [second DUI conviction while still on probation for first conviction did not reflect moral turpitude]; see *In re Carr* (1988) 46 Cal.3d 1089, 1090-1091 [attorney pleading no contest to two separate counts of DUI did not reflect moral turpitude].) Defendant's reliance on *People v. Forster* (1994) 29 Cal.App.4th 1746 is misplaced. The defendant in that case suffered *three* prior *felony* DUI convictions and was on trial for a fourth alleged violation. (*Id.* at p. 1757.) The *Forster* court distinguished *In re Carr* on the basis "it involved misdemeanor driving under the influence, not the felony driving under the influence with three prior

15

convictions of driving under the influence." (*Forster*, at p. 1757.) Lee's single misdemeanor conviction in 2011 and arrest in 2013 are more akin to the conduct in *In re Kelley* and *In re Carr* than to the highly recidivist felony conduct in *Forster*. Accordingly, we conclude the trial court did not abuse its discretion in finding Lee's DUI conviction and arrest were not instances of moral turpitude for impeachment purposes.

We also find no abuse of discretion in the trial court's alternative ruling excluding Lee's DUI conviction and arrest under section 352. The court was properly concerned with the "risk of sidelining the jury into an issue that is not the focus of this case and this trial." Lee's conviction two years before the incident and arrest one month later have little probative value regarding whether Lee was intoxicated on January 17, compared to their consumption of time and risk of prejudice. This is particularly true of Lee's arrest, which has the added problems of proof not applicable to convictions. (*Wheeler, supra*, 4 Cal.4th at pp. 296-297; *People v. Lopez* (2005) 129 Cal.App.4th 1508, 1523 (*Lopez*) ["evidence of *mere arrests* is inadmissible because it is more prejudicial than probative"], italics added.)

We similarly find no error in the trial court's exclusion of evidence that Lee may have lied to police during her 2013 arrest. The record does not make clear whether Lee deliberately misled police or was simply disoriented. Given this uncertainty, the court did not err in declining to "sidetrack the jury" on this ambiguous and collateral issue that would have required its own mini-trial.

Finally, we conclude the trial court did not abuse its discretion in excluding evidence Lee tested positive for opiates six days after the incident. As the court

16

observed, defendant offered no evidence indicating the positive test results established Lee was under the influence on January 17. Defendant's argument that it shows she was under the influence when she first reported the strangulation is unavailing because that is not one of the recognized circumstances in which a witness's drug use is admissible. (See *People v. Panah, supra*, 35 Cal.4th at p. 478.) Nor are we persuaded it should be admissible under the circumstances here—defendant made no offer of proof about Lee's opiate levels on the date of the incident and the impact it would have had on her ability to accurately report the strangulation. Defendant was fully permitted to cross-examine Lee about her drug use on the day of the incident and about the prior incidents admitted under section 1109.

Defendant's "attempt to inflate garden-variety evidentiary questions into constitutional ones is unpersuasive." (*People v. Boyette* (2002) 29 Cal.4th 381, 427 (*Boyette*).) The trial court's rulings did not prevent defendant from vigorously attempting to impeach Lee. To the contrary, defendant's appellate brief acknowledges he argued below that Lee (1) fabricated the domestic violence incident because she felt animosity toward defendant; (2) lacked credibility because she did not report the strangulation to police on the day of the incident or the day after, but rather, waited nearly one week; and (3) lacked credibility about the amount of beer she drank the day of the incident. On this record, defendant's claims of evidentiary error do not implicate his constitutional rights.

Even if we were to conclude the trial court erred, we would find no prejudice. "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional [*People v. Watson* (1956) 46 Cal.2d 818] test: The reviewing court must ask

17

whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "As a general rule, 'evidence which merely impeaches a witness is not significant enough to make a different result probable . . . .' " (*People v. Green* (1982) 130 Cal.App.3d 1, 11.)

In addition to Lee's testimony regarding the January 17 incident, the jury (1) heard Lee's testimony regarding prior incidents of domestic violence, which was corroborated in part by Lee's former supervisor and Van Dyck; (2) heard a recording of Lee's 911 call wherein she reported defendant "jumped up and down *on [her] throat*" (italics added); (3) heard Van Dyck's testimony that he heard a crashing noise during the time Lee said the incident occurred; (4) saw photographs depicting bruises on Lee, which Van Dyck testified were not there before the incident; (5) heard Detective Vella's testimony that Lee's injuries were consistent with strangulation, the bruising pattern was consistent with manual strangulation as opposed to use of a ligature, and the coloration of the bruising on January 22 indicated they were several days old; and (6) heard Detective McNamara's testimony it is very common for domestic violence victims to minimize what happened to them and that Lee appeared to be doing so regarding her strangulation. Based on the totality of the evidence, it is not reasonably probable that exclusion of Lee's conduct involving alcohol and drugs affected the verdict.

## II. *Exclusion of Officer Lorenzo's Domestic Violence Arrest*

Defendant contends the trial court erred by excluding evidence showing Officer Lorenzo was arrested for domestic violence. Defendant contends the evidence is relevant and admissible (1) as general impeachment evidence because domestic violence is a

18

crime of moral turpitude (see *People v. Rodriguez* (1992) 5 Cal.App.4th 1398, 1402); and

(2) to show Lorenzo has a propensity toward violence such that defendant was entitled to

use self-defense against Lorenzo's alleged use of excessive force (see *Lemelle v. Superior*

*Court* (1978) 77 Cal.App.3d 148, 163 ["Evidence of an officer's tendency to violence . . .

is admissible in a prosecution in which the defendant is charged with battery on a peace

officer and resisting arrest."].)

### A. *Relevant Trial Court Proceedings*

Before trial, defendant moved under *Pitchess v. Superior Court* (1974) 11 Cal.3d

531 to discover personnel information of Officers Call and Lorenzo regarding any

allegations of excessive use of force, dishonesty, or fabrication of evidence. The trial

court found no good cause to hold an in camera hearing because (among other reasons)

defendant did "not provide specific factual descriptions of the conduct of the officers"

regarding alleged use of excessive force. Defendant does not challenge this ruling on

appeal.

Defendant's original trial counsel contacted the prosecutor after he saw media

reports indicating Officer Lorenzo was arrested for domestic violence in April or May

2014. Lorenzo was arrested but never charged. The People advised defense counsel they

would not be disclosing material regarding the arrest under *Brady v. Maryland* (1963)

373 U.S. 83,[11] and moved in limine to exclude it. Defendant argued he should be able to

---

[11] Under *Brady v. Maryland, supra*, 373 U.S. 83, "the prosecution has a
constitutional duty to disclose to the defense material exculpatory evidence, including
potential impeaching evidence." (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th
696, 709.)

19

review the arrest materials and cross-examine Lorenzo about them to support a self-defense claim against the resisting arrest count.

The trial court directed the prosecutor to provide the arrest records for the court's in camera review to determine whether Lorenzo's reported acts of domestic violence were similar to defendant's excessive force claim. The prosecutor later reported he was still working on gathering the documents and suggested he would consider limiting the resisting arrest count to defendant's conduct with respect to Officer Call, thereby rendering Lorenzo's character and conduct irrelevant. The trial court ruled it would determine whether the evidence was relevant and whether it would review the evidence in camera after it heard both officers' testimony.

During opening statement, the prosecutor referred to both officers when discussing the resisting arrest count: "They're going to tell you that when they opened the door to transport him from one of the vehicles to another police vehicle, that [defendant] pushed the door open. He ran towards the police officer. He was resisting their efforts and delaying them into trying to keep the peace and get him into custody."

Officer Lorenzo testified about a "scuffle" that initially involved only defendant and Officer Call. Lorenzo saw defendant kick open the door of Call's vehicle and try to exit, but Call pushed him back inside. As Lorenzo went to help Call, Call pulled defendant out of the vehicle and defendant "was pretty much pulling away at Officer Call during that point, and that's when [Lorenzo] put [his] hands on [defendant's] arms, kept telling him to relax." When defendant continued struggling, both officers moved him to the ground.

20

After Officer Lorenzo testified, the People and the trial court determined the resisting arrest count would relate only to defendant's response to Officer Call before Lorenzo placed his hands on defendant. The court indicated it would conduct an in camera review of the documents relating to Lorenzo's arrest to determine whether they should be disclosed to defendant.

After conducting the in camera review, the trial court excluded evidence of Officer Lorenzo's alleged domestic violence. Applying section 352, the court reasoned that because the People were limiting the resisting arrest count to defendant's conduct before Lorenzo touched defendant, evidence of Lorenzo's character for violence had minimal relevance, if any. By contrast, the trial court stated that introduction of the evidence would constitute an "undue consumption of time on an extraneous matter and would distract the jury with issues that are not the focal point of this trial." Specifically, because Lorenzo was never charged or convicted, the trial court was concerned the evidence "would result in a mini-trial over whether or not Officer Lorenzo, in fact, engaged in that alleged conduct."

Later during trial, Officer Call testified defendant kicked the vehicle door open and quickly exited, prompting Call to push him back inside. Call said Officer Lorenzo came to help at that point and they got defendant out of the car again. When defendant lunged toward the officers, Call pushed defendant back against the vehicle. Call stated he was "fairly certain" he had his hands on defendant at that point, but was not sure Lorenzo did or whether Lorenzo helped push defendant against the vehicle. Call thought he might

21

have been "crowding" Lorenzo out so that Lorenzo could not reach defendant. Both officers then moved defendant to the ground.

The trial court instructed the jury that to find defendant guilty of resisting arrest, it must find he resisted, obstructed, or delayed *Officer Call* by doing at least one of the following: "one, kicking the patrol vehicle open; [¶] two, trying to get out of the patrol car; [¶] three, lunging forward once out of the patrol car; [¶] and four, being uncooperative as *Officer Call* held the defendant up against the patrol vehicle." (Italics added.)

During closing argument, the prosecutor limited his argument regarding the resisting arrest count to defendant's conduct toward Officer Call. Defense counsel acknowledged in closing, "Okay. So they're relying solely on the actions of Officer Call before Officer Lorenzo appears."

### B. *Analysis*

We conclude the trial court did not abuse its discretion by excluding Officer Lorenzo's arrest under section 352.

We have reviewed the sealed records the trial court reviewed in camera. These records show the facts underlying Officer Lorenzo's arrest were highly disputed and uncertain, implicating the problems of proof of which our Supreme Court has warned. (See *Wheeler, supra*, 4 Cal.4th at pp. 296-297; see also *Lopez, supra*, 129 Cal.App.4th at p. 1523.) Determining whether Lorenzo engaged in domestic violence would have required an extensive mini-trial that might have exceeded the length of defendant's trial, which consisted of only two days of testimony.

22

This substantial risk of undue time consumption outweighs the limited probative value of Officer Lorenzo's arrest. Lorenzo's arrest had minimal relevance to support defendant's self-defense claim to the resisting arrest count. First, the trial court accepted the People's offer to limit the resisting arrest count to defendant's conduct before Lorenzo ever touched defendant. Thus, Lorenzo's alleged subsequent use of excessive force is irrelevant to a self-defense claim regarding defendant's prior conduct toward Officer Call. (See *People v. Hairston* (2009) 174 Cal.App.4th 231, 238 ["A defendant can be convicted under section 148 for each peace officer he obstructs, even if he engages in only one act of obstruction."]; *Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 899 (*Yount*) [where defendant is lawfully arrested and resists arrest, " 'subsequent use of excessive force would not negate the lawfulness of the initial arrest attempt, or negate the unlawfulness of the criminal defendant's attempt to resist it' "].)

Second, contrary to defendant's concern that the prosecutor's opening statement and the officers' testimony referenced defendant's conduct after Officer Lorenzo touched defendant, the trial court specifically instructed the jury to limit its deliberations to defendant's conduct toward Officer Call. We presume the jury followed this instruction. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

For the same reasons, we find no abuse of discretion in the trial court's exclusion of Officer Lorenzo's arrest as impeachment evidence. Impeaching Lorenzo's testimony would have served little purpose as it was nearly all corroborated by other witnesses or physical evidence. His testimony about Lee's injuries was substantiated by Lee's testimony, the detectives' testimony, and photographs. His testimony about defendant

23

resisting arrest was corroborated by Officer Call's testimony. And his testimony that Lee did not appear intoxicated was corroborated by Van Dyck's testimony that Lee was not slurring her speech when he saw her talking on the phone with police.[12]

Finally, for the same reasons discussed in part I.C., *ante*, we find unpersuasive defendant's "attempt to inflate garden-variety evidentiary questions into constitutional ones." (*Boyette, supra*, 29 Cal.4th at p. 427.)

### III. *Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct by indirectly commenting on the fact defendant did not testify at trial. The People contend defendant forfeited this issue by failing to object on this ground during trial, but also address the merits of his claim. Defendant argues in reply that he did not forfeit the challenge, but even if he did, the forfeiture is the result of ineffective assistance of counsel.

### A. *Relevant Trial Court Proceedings*

During closing, the prosecutor argued: "And look what he did to her, ladies and gentlemen. You don't have to be an expert to realize what he did to her. You've all fallen off a bicycle or walked into a table. These are huge bruises. These are significant injuries. And this was the second worse beating he ever gave her. She testified to that. The worst day of her life was the event two days after their wedding when even Michael

---

12    During closing argument, the prosecutor argued, without objection, that the recording of Lee's 911 call indicates she was not intoxicated. We are unable to verify this claim because, although the transcript of the call is in the appellate record, the recording is not.

Van Dyck told you she had welts on her face. *And you have not been given one reason to vote not guilty in this case.*" (Italics added.) Defense counsel did not object.

Moments later, the prosecutor argued: "And so I just have some ideas, things that I thought just in considering—in weighing the evidence just before I wrap up this portion of my closing argument. And again, *I suggest that there's been no evidence presented to you to the contrary to support any other version of the events that were given through the evidence you heard in this case from these witnesses.*" (Italics added.) Defense counsel did not object.

Defense counsel addressed these points in his closing argument: "So the prosecution put on their closing argument before me earlier this morning. I just want to let you know that the prosecution did try and misguide you as to what we needed to prove in this case. We are the defense. We don't have to prove anything in this case. The burden of proof is on the prosecution to prove each and every element of the charges against Joshua Smith beyond a reasonable doubt. So we don't have to explain that there's another scenario that occurred that resulted in the injuries in this case. All that matters is that the prosecution—we hold them to that standard beyond a reasonable doubt and they don't shift that burden to the defense. And it would be a complete fallacy for them to do otherwise."

The trial court instructed the jury with CALCRIM No. 220 regarding the People's burden of proof: "A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. [¶] . . . [¶] . . . In deciding whether the People have proved their case beyond a

25

reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

The trial court instructed the jury with CALCRIM No. 355 regarding defendant's right not to testify: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

The court also instructed the jury with CALCRIM No. 222 that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discussed the case, but their remarks are not evidence."

### B. *Relevant Legal Principles*

#### 1. *Prosecutorial Misconduct*

" 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not

26

a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " [Citation.]' " (*Fuiava, supra*, 53 Cal.4th at p. 679.) "A prosecutor's 'argument may be vigorous as long as it is a fair comment on the evidence, which can include reasonable inferences or deductions to be drawn therefrom.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 736.)

Failing to object to misconduct and to request an admonition that the jury disregard the misconduct forfeits the issue on appeal, unless an objection would have been futile or an admonition ineffective. (*People v. Tully* (2012) 54 Cal.4th 952, 1049; *Fuiava, supra*, 53 Cal.4th at p. 679.)

## 2. Griffin *Error*

In *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*), the United States Supreme Court held the Fifth Amendment forbids a prosecutor from commenting on a defendant's election not to testify in his own defense. (*Griffin*, at p. 615.) " '*Griffin* forbids either *direct* or *indirect* comment upon the failure of the defendant to take the witness stand.' " (*People v. Hovey* (1988) 44 Cal.3d 543, 572, italics added.) Thus, for example, "a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided *only* by the defendant, who therefore would be required to take the witness stand." (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339.) "If, however, the evidence could have been contradicted by witnesses other than the defendant, the prosecutor may without violating defendant's privilege against self-incrimination describe the evidence as 'unrefuted' or 'uncontradicted.' " (*People v. Johnson* (1992) 3 Cal.4th 1183, 1229 (*Johnson*).)

*Griffin* does not "bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses." (*Bradford, supra*, 15 Cal.4th at p. 1339.) Thus, " ' "[a]s a general principle, prosecutors may allude to the defense's failure to present exculpatory evidence" [citation], and such commentary does not ordinarily violate *Griffin* or erroneously imply that the defendant bears a burden of proof [citations].' " (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1006, fn. 2 (*Mesa*).)

### 3. *Ineffective Assistance of Counsel*

To establish a claim of ineffective assistance of counsel under the Sixth Amendment, a defendant bears the burden of showing:  (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the defendant suffered prejudice, that is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694 (*Strickland*); *People v. Hinton* (2006) 37 Cal.4th 839, 876.)

In examining whether a defendant met his burden on the first prong, courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland, supra*, 466 U.S. at p. 689; see *People v. Hinton, supra*, 37 Cal.4th at p. 876.)  We will not find ineffective representation "unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)  " 'Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference

28

[citations], failure to object seldom establishes counsel's incompetence.' " (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

"It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*Mesa, supra*, 144 Cal.App.4th at p. 1008.) The *Strickland* " 'reasonable probability' standard applies to the evaluation of a Sixth Amendment claim of ineffective assistance of counsel, even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights." (*Mesa*, at pp. 1008-1009.)

## C. *Analysis*

By failing to object to the prosecutor's alleged *Griffin* error, defendant forfeited his prosecutorial misconduct challenge on appeal. (*Mesa, supra*, 144 Cal.App.4th at p. 1006.) "Nothing in the record suggests an objection by [defendant's] counsel would not have been sustained and followed immediately by an admonition to the jury to disregard the argument or that these remedies would not have cured any prejudice." (*Id.* at p. 1007.) The challenge is, therefore, forfeited.

We are not persuaded by defendant's claim that this forfeiture resulted from the ineffective assistance of counsel. First, defense counsel did not object to the alleged *Griffin* error; rather, he directly addressed it in his own closing argument. This suggests the lack of objection was the product of a tactical decision rather than an error.

Second, defendant has not established he was prejudiced by the lack of objection. The trial court instructed the jury regarding defendant's constitutional right not to testify,

29

that the jury must not draw any inferences from defendant's exercise of that right, that the People bear the burden of proof beyond a reasonable doubt, and that counsel's arguments are not evidence. Had the trial court sustained an objection on the basis of *Griffin*, the court likely would have repeated these instructions. This "may have had some marginal benefit" to defendant. (See *Mesa, supra*, 144 Cal.App.4th at p. 1011). However, based on the evidence of defendant's guilt (discussed in part I.C., *ante*), the breadth of the prosecutor's entire closing argument, and the limited nature of the prosecutor's alleged indirect *Griffin* error, we are not convinced it is reasonably probable the jury would have reached an outcome more favorable to defendant had his counsel objected. (See, e.g., *Mesa*, at p. 1011.)

In any event, even if we were to reach the merits, defendant would not have persuaded us that the prosecutor committed *Griffin* error. The prosecutor's statements to the jury at issue—"you have not been given one reason to vote not guilty in this case" and "there's been no evidence presented to you to the contrary to support any other version of the events that were given through the evidence you heard in this case from these witnesses"—are substantially similar to language the California Supreme Court has found does not run afoul of *Griffin*. In *Bradford,* the court held the prosecutor's comment that "there is no evidence to the contrary" did not constitute *Griffin* error because the lack of evidence might have been overcome with evidence other than the defendant's testimony. (*Bradford, supra*, 15 Cal.4th at pp. 1338-1339.) In *Johnson*, the court found no *Griffin* error where the prosecutor argued "[t]he uncontradicted evidence is that the defendant was there, that the defendant did kill [one victim], that the defendant did shoot [another

30

victim].  That is uncontradicted." (*Johnson, supra*, 3 Cal.4th at p. 1229.)  The *Johnson* court reasoned that because the defense theory was that someone else committed the crime, defendant could have contradicted the prosecution evidence with alibi witnesses. (*Ibid.*)

Citing *Bradford* and *Johnson*, the court recently found no *Griffin* error in the prosecutor's argument that " '[i]f the defense had a plausible, reasonable explanation why the defendant was in the yard that morning, they would have given it.  They haven't.' " (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1525.)  The *Sanchez* court found the defendant could have contradicted the prosecution evidence with testimony of an associate of the defendant who was nearby when police apprehended the defendant.  (*Id.* at pp. 1526-1527.)

Similarly here, defendant's testimony was not the only evidence that could have contradicted the prosecution evidence regarding what happened on January 17.  For example, defense counsel argued during closing that "[a]s to [the strangulation], [t]he prosecution's relying solely on Detective Vella's training and experience on strangulation cases."  Defendant could have contradicted Vella with an expert of his own to testify Lee's bruises were not consistent with strangulation.  Similarly, defendant could have called a law enforcement expert to contradict Detective McNamara's testimony that domestic violence victims commonly minimize what happened to them, as he opined Lee was doing.  Finally, defendant could (and did) attempt to contradict the People's account of what happened by cross-examining Van Dyck about his observations that day.  The prosecutor's reference to "these witnesses" during one of the challenged portions of his

31

closing argument further demonstrates the People's case was not strictly the "he said, she said" scenario defendant now contemplates. Therefore, even if defendant had not forfeited his prosecutorial misconduct challenge by failing to object to the prosecutor's alleged *Griffin* error, we would still affirm.

DISPOSITION

The judgment is affirmed.


HALLER, J.

WE CONCUR:


BENKE, Acting P. J.


IRION, J.